**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          sbogdanovich@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DAISY GARZA, individually and on behalf of all others similarly situated,<br><br>                            Plaintiff,<br><br>      v.<br><br>ALAMO INTERMEDIATE II HOLDINGS, LLC<br><br>                        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Daisy Garza ("Plaintiff"), individually and on behalf of all other persons similarly situated ("Class members"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant Alamo Intermediate II Holdings, LLC ("Alamo") is a cinema chain that develops, owns, and operates the website, drafthouse.com, where consumers can purchase tickets to watch movies at various Alamo theater locations throughout the United States.[1]  Yet when moviegoers visit an Alamo cinema, they are not lone stars.  Instead, they are chaperoned by a sizable number of digital marketing companies – like Meta Platforms, Inc. ("Meta" or "Facebook"), TikTok, Inc. ("TikTok"), The Trade Desk, Inc. ("Trade Desk"), NextRoll, Inc., ("NextRoll" or "AdRoll"), and Google LLC ("Google").  This army of advertisers not only remember the Alamo, but exactly who watched what, when, and where.

2.      Alamo has installed various "tracking pixels" on its website – ensuring that these tech companies can continue to keep a watchful eye on us after the cinema lights dim and the films begin.  The tracking pixels secretly and surreptitiously send consumers' personally identifiable information ("PII") to third-party providers – every time consumers purchase a movie ticket on Alamo's website.  Through these tracking pixels, companies like Facebook, TikTok, Google, Trade Desk, and AdRoll collect the titles of the movies consumers purchased tickets to see, along with the cinema locations where those movies aired.  Some of these tracking pixels included unique user ID numbers that these companies use to identify particular individuals and link them to their movie metadata.  Other companies are able to identify particular individuals and link them to their movie metadata by also collecting their browsers' IP addresses and cross referencing that with other websites that individual's IP address visited.  All this is done to build digital dossiers on people and retarget them for advertising with alarming accuracy.  Because Alamo collects and discloses all

---

[1] ALAMO, https://drafthouse.com/#now-playing.

this and other sensitive data about consumers without their written consent, Alamo violated the Video Privacy Protection Act ("VPPA") and California Civil Code § 1799.3.

3.    As Congress has recognized, "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. at 10 (Aug. 3, 1988)).  Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality—in other words, their most personal and intimate details.  *Id.*  In enacting the VPPA, Congress decided that this intimate information "should be protected from the disruptive intrusion of a roving eye."  *Id.*

4.    The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers."  S. Rep. No. 100-599, at 8.  "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent."  *Id.*

5.    Similarly, the State of California has given consumers even broader privacy protection through Cal. Civ. Code § 1799.3, which not only forbids disclosure of personal information, but also of "any record, including sales or rental information."

6.    Alamo violated the VPPA and Cal. Civ. Code § 1799.3 by knowingly disclosing this sensitive data – including the specific movie tickets Plaintiff and Class Members purchased and the Alamo cinema location those tickets were for – to unrelated third parties without their consent.  Alamo installed various computer codes on its website, called the "Meta Tracking Pixel," "TikTok Tracking Pixel," "TradeDesk Tracking Pixel," "AdRoll Tracking Pixel," and "Google Analytics," which track and record Plaintiff and Class Members' private movie ticket purchasing activity and discloses it to third-party providers without Plaintiff and Class Members' consent.  The third-party providers, in turn, use Plaintiff and Class Members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.

## PARTIES

7.    Plaintiff Daisy Garza is, and has been at all relevant times, a citizen of California who resides in San Francisco, California.  Ms. Garza visited the Alamo website on her Safari

browser to purchase movie tickets and was logged into her facebook.com account on that same Safari browser.

8.    Defendant Alamo Intermediate II Holdings, LLC, Inc. is a Delaware limited liability company with its principal place of business in Austin, Texas.  Defendant Alamo's ticket-purchasing platform is used throughout California and the United States.  Alamo also has theaters in California and throughout the United States.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA).  And this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2).  The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members of the United States Class and the California Class, and there is minimal diversity.

10.    This Court has personal jurisdiction over Defendant because it conducts substantial business within California, including the operation of theatres in California and the sale, marketing, and advertising of Alamo within California.  Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this state.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

### A.    The VPPA

12.    The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Paul Simon explained:

> [A]s we continue to move ahead, we must protect time honored values that are so central to this society, particularly our right to privacy.  The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before.  Every day Americans are forced to provide to businesses and others personal information without having any control

over where that information goes.  Those records are a window into our loves, likes, and dislikes.

S. Rep. 100-599, at 7-8 (internal ellipses and brackets omitted).

13.     The VPPA prohibits "[a] video tape service provider [from] knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

14.     As Senator Patrick Leahy explained while introducing the VPPA, legislators were particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance.  These 'information pools' create privacy interests that directly affect the ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard.  The bill prohibits video stores from disclosing "personally identifiable information"— information that links the customer or patron to particular materials or services. In the event of an unauthorized disclosure, an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

15.     The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction-oriented.  It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider."  S. Rep. 100-599, at 12.

**B.     Cal. Civ. Code § 1799.3**

16.     Cal. Civ. Code § 1799.3 provides a wider breadth of protection for consumers by requiring that:

> No person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual.

17.     Cal. Civ. Code § 1799.3 does not require that the information being disclosed by video recording sales or rental service providers be *identifiable* to any one particular person. Instead, the statute forbids the disclosure of generalized "personal information" without that person's consent, even if that information does not serve to identify them.  The statute also forbids the mere disclosure of "the contents of any record, including sales or rental information," such as the mere title of the movie ticket purchased.  We know the statute *independently* forbids the "contents of any record," from being disclosed without consent because the phrase is preceded by the word, "or" – not "and."  Under California law, "the plain and ordinary meaning of the word 'or,' when used in a statute, is to designate separate, disjunctive categories.  The word 'or' suggests alternatives.  In its ordinary sense in a statute, the function of the word 'or' is to mark an alternative such as 'either this or that.'"  *In re E.A.*, 24 Cal. App. 5th 648, 661 (2018) (cleaned up).

### C.     The Meta Tracking Pixel

18.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2]  Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html.

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[5] FACEBOOK, SIGN UP, https://www.facebook.com/.

19.     Meta owns facebook.com, and generates revenue by selling advertising space on that website, and other applications it owns, like Instagram.[6]

20.     Meta sells advertising space by highlighting its ability to target users.[7]  Meta can target users so effectively because it surveils user activity both on and ***off its site***.[8]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

21.     Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for

---

[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14]  One such Business Tool is the Meta Tracking Pixel.

22.     The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[15]  When the Meta Tracking Pixel captures an action, it sends a record to Meta. Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

23.     Advertisers control what actions – or, as Meta calls it, "events" – the Meta Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[16] Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  An advertiser can also create their own tracking parameters by building a "custom event."[18]

24.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[20]  Pixel-specific Data includes "the Pixel ID and cookie."[21]

---

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[15] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[16] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[19] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[20] Id.

[21] Id.

---

**D.      Alamo and the Meta Pixel**

25.      Alamo is a cinema chain that offers a website where consumers can purchase movie tickets.

26.      Defendant installed the Meta Tracking Pixel to track consumers' every move while on Alamo's website.  In fact, it tracks no fewer than three different events: "Purchase," and "PageView," with "Button Click Automatically Detected."

27.      Once a consumer chooses a movie they would like to purchase tickets for on Alamo's website and clicks on the "Buy Tickets" button for that particular movie, at least two Meta Tracking Pixel events are captured on this page: Page View, along with Button Click Automatically Detected.  The Meta Tracking Pixel transmits the Button Click event to Meta.  This Button Click event contains various types of metadata that tell Meta exactly which movie a consumer is purchasing tickets for and which Alamo theater location those tickets are for.  *See* Figure 1.  For example, in Figure 1, that movie is *Killers of the Flower Moon* and the Alamo theater location is in San Francisco, CA.

**Figure 1**



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

28.    Consumers then choose their seat selection and press the "Next" button.  This generates another two Meta Pixel events, PageView with Button Click Automatically Detected. Similarly, the events contain metadata that tell Meta which movie a consumer is purchasing tickets for and at which Alamo location.  *See* Figures 2-3.

**Figure 2**

**Figure 3**



29.     Clicking the "Next" button takes consumers to the checkout page.  Once on the checkout page, two more meta pixel events are generated, PageView with Button Click Automatically Detected, which, once again, contains metadata that tell Meta which movie a consumer is purchasing tickets for and at which Alamo location.  *See* Figure 4.

1

**Figure 4**



30.     When a visitor purchases movie tickets on Alamo's website while logged into Facebook, Defendant compels a visitor's browser to transmit an identifying "computer cookie" to Facebook called "c_user."  The c_user cookie contains that visitor's unencrypted Facebook ID. Figures 5 through 6, next page, show a copy of the c_user cookie being transmitted to facebook.com, as shown on the webpage by accessing developer tools by clicking the F12 button on a keyboard.

**Figure 5**



**Figure 6**



31.     The c_user cookie is personally identifiable information because it contains a
consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Facebook—to
identify the individual consumer.  Specifically, if one types www.facebook.com/[FacebookID] into
a web browser, it will load that individual's Facebook page.  For example, the c_user cookie in
Figures 3-5 above is 1528550551, and www.facebook.com/1528550551 leads to the undersigned's
Facebook page.

32.     The Meta Tracking Pixel transmits additional cookies to Meta.

33.     The "fr" cookie contains, at least, an encrypted Facebook ID and browser
identifier.[22]  Facebook, at a minimum, uses the fr cookie to identify particular users.[23]

---

[22] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[23] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

34.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

35.     The Meta Tracking Pixel uses both first and third-party cookies.  A first-party cookie is "created by the website the user is visiting" – *i.e.*, Alamo.[24]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting" – *i.e.*, Facebook.[25]

36.     Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

37.     A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile – and all personal information publicly listed on that profile – by appending the Facebook ID to the end of https://facebook.com/.

38.     Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, that a given consumer purchased a ticket to a particular movie at a particular Alamo cinema location.[26]

39.     Alamo begins to collect this information through tracking pixels when a user first chooses a movie to purchase tickets for on drafthouse.com.

40.     Defendant discloses these identifiers so Meta can match them with a corresponding Facebook profile and link it to a consumer's subsequent activity on Alamo's website.

41.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's movie viewing behavior.

---

[24] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[25] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

[26] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

42.     Meta confirms that it matches activity on Alamo with a user's profile.  Meta allows users to download its "off-site activity," which is a "summary of activity that businesses and organizations share with [it] about [consumers'] interactions, such as visiting [organizations'] apps or websites."[27]  The off-site activity report confirms Alamo identifies an individual's movie viewing activities.

**Figure 7**



E.     **Alamo and Other Third-Party Tracking Pixels**

43.     Besides installing the Meta Tracking Pixel, Defendant also installed the TikTok Tracking Pixel, the TradeDesk Tracking Pixel, the AdRoll Tracking Pixel, and Google Ad Services and Analytics to track consumers' every move while on Alamo's website.  The TikTok, TradeDesk, and AdRoll tracking pixels all work in much the same way as the Meta Tracking Pixel.  As the TradeDesk explains, "[a] tracking tag, or a pixel, is a piece of … code that is placed on a

---

[27] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?,
https://www.facebook.com/help/2207256696182627.  As discussed there, the Off-Facebook Activity is only a "summary" and Facebook acknowledges "receiv[ing] more details and activity than what appears in your Facebook activity."  What is more, it omits "information we've received when you're not logged into Facebook, or when we can't confirm that you've previously used Facebook on that device."

webpage to track visitor activity on the page for … reporting and attribution purposes."[28]  "Events to be tracked can be differentiated by names assigned to the respective tracking tags… for example 'Purchase Conversion,' 'Landing Page Visit,' 'Add Items to Shopping Basket,' and so on."[29]  As AdRoll puts it, its pixel "is a … code snippet placed in the header of your site that tracks everything your visitors are doing on your site."[30]

44.     Like the Meta Tracking Pixel, when a consumer completes the payment for movie tickets on Alamo's website, these various Tracking Pixels generate additional events notifying these third-party websites that individuals have purchased movie tickets.  For example, the AdRoll Pixel generates a "Tickets Purchased" event which tells AdRoll how much a moviegoer spent on the ticket as well as the currency used.  *See* Figure 8.  AdRoll also receives the URL of the webpage, which contains the title of the film purchased, as well as the theatre location.  For example, in Figure 9, next page, the title of the movie was *Killers of the Flower Moon* and the Alamo cinema location was San Francisco, CA.

**Figure 8**



[28] THE TRADE DESK, PARTNER PORTAL, TRACKING TAGS,
https://partner.thetradedesk.com/v3/portal/data/doc/TrackingTagsOverview.

[29] *Id.*

[30] ADROLL, HELP CENTER, WHAT IS THE ADROLL PIXEL?, https://help.adroll.com/hc/en-us/articles/211846018-What-is-the-AdRoll-Pixel-
#:~:text=The%20AdRoll%20Pixel%20is%20a,is%20setting%20up%20your%20pixel.

**Figure 9**



45.     The AdRoll Tracking Pixel also compels Alamo moviegoers' browsers to send adroll.com a number of cookies that AdRoll uses to target moviegoers for advertising.  *See* Figure 10.

**Figure 10**



46.     According to various third-party companies' cookie policies, the "_adroll" cookie "is used to identify the visitor across visits and devices. It is used by real-time bidding for advertisers to present relevant advertisement."[31]  The "_adroll_shared" cookie meanwhile "[c]ollects data on the user across websites – This data is used to make advertisement more relevant."[32]  Both cookies remain on users' browsers for 395 days.[33]

---

[31] CRITICALARC, COOKIE POLICY, https://criticalarc.com/cookie-policy/; DEKO, COOKIE POLICY, https://www.dekopay.com/cookies.

[32] *Id.*

[33] *Id.*

47.     The TikTok Tracking Pixel similarly generates an event titled "Complete Payment." This event also reveals the title of the movie the consumer chose to purchase tickets for and the location of the Alamo cinema the tickets were purchased for, how much they cost, and what currency was used.  *See* Figure 11.

**Figure 11**



48.     TikTok employs multiple cookies and uses them to learn about Alamo moviegoers. TikTok then uses the information it gathers to deliver Alamo's ads "more efficiently to people who are likely to convert (into a paying customer)."[34]

---

[34] TIKTOK, COOKIES WITH TIKTOK PIXEL, https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?redirected=2.

**Figure 12**



| Name | Value | Domain |
|---|---|---|
| _ttp | 2MyFhIyRVR4foF5Wxqugm8yJDAl | .tiktok.com |
| tta_attr_id | 0.1680630400.7218252603237335042 | .tiktok.com |
| tta_attr_id_mirror | 0.1680630400.7218252603237335042 | .tiktok.com |
| uid_tt_ss | 03b7c434e07ab5ca38d4691cc064e7103570a50fc4fe252290f1... | .tiktok.com |
| sessionid_ss | 8125bff1bfbb512cac34032f4fe8453d | .tiktok.com |
| ssid_ucp_v1 | 1.0.0-KDAzYzAwZmExNTRiZGZmNmE1ZjY1ZjE4N2YzODdjYjg... | .tiktok.com |
| ttwid | 1%7CiOd0DnKreDh0mvBEgeemql1-WYOR3jX8UF9WeXAaiO... | .tiktok.com |
| passport_csrf_token | df619480010db0a78045e0aa1678e2c4 | .tiktok.com |
| msToken | ZfTbdM_n_QcSkjxHKCWg5JuZhfn2GX14w1ojNF2xZUNctPOO... | .tiktok.com |

49.     Alamo also employs Google Ad Services.  This discloses to Google the title of the movie the consumer purchased tickets for, the location of the Alamo cinema the tickets were purchased for, the quantity of tickets purchased, and how much they cost.

**Figure 13**

50.     Alamo also employs the TradeDesk Tracking Pixel and Google Analytics, which similarly share the name of the movie the consumer is purchasing tickets for on Alamo's website. *See* Figures 14-15 (disclosing that a consumer purchased tickets for *Anatomy of a Fall*).

**Figure 14**

**Figure 15**



51.     Moreover, because the Meta, TikTok, AdRoll, and TradeDesk tracking pixels, as well as Google Ad Services and Google Analytics application programming interfaces are all programmed in the code of the Alamo website, the information described above is transmitted to these third parties as a particular webpage is loading on a particular visitor's browser.  This allows all these third parties to obtain a real-time look into what visitors are doing on the Alamo website.

**F.     Alamo's Failure to Obtain Consent**

52.     While Alamo has been disclosing consumers' PII to Meta, and has been disclosing consumers' personal information and video purchase records to other third-party providers such as TikTok, TradeDesk, AdRoll, and Google, it has not properly obtained consumer consent as required under VPPA and Cal. Civ. Code § 1799.3.

53.     The VPPA only allows a video tape service provider to disclose PII of a consumer to a third party "with the informed, written consent (including through an electronic means using the Internet) of the consumer that—(i) is in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer."  18 U.S.C. § 2710(B)(i).  The video tape service provider must also "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."  18 U.S.C. § 2710(B)(iii).

54.     Under Cal. Civ. Code § 1799.3, a person providing video recording sales or rental services must obtain written consent of the individual whose personal information or records of sales or rental information is being disclosed.

55.     Alamo failed to meet the consent requirements under both VPPA and Cal. Civ. Code § 1799.3 because at no point did Alamo obtain informed, written consent, in a separate and distinct form (as required by VPPA), or simply written consent (as required by Cal. Civ. Code § 1799.3) from consumers.

**G.     Experience of Plaintiff**

56.     In or around September 2022, Plaintiff Daisy Garza purchased tickets for a movie from Alamo.  Once Plaintiff Garza purchased the tickets, Defendant disclosed her PII to Meta and other personal information and video purchase records to TikTok, TradeDesk, AdRoll, and Google.

57.     When Plaintiff Garza purchased movie tickets from Alamo, Defendant disclosed her event data, which recorded and disclosed the movie's title and the Alamo cinema location she purchased the tickets for to Meta, TikTok, TradeDesk, AdRoll, and Google.  This event data also included the price of the tickets purchased, and, in some cases, the quantity of tickets – allowing these third parties to infer whether Ms. Garza was going solo or on a date.  Alongside this event data, Defendant also disclosed identifiers for Plaintiff Garza including the c_user and fr cookies to Meta.

58.     By disclosing her event data and identifiers, Defendant disclosed Plaintiff Garza's personally identifiable information to Meta and Plaintiff's personal information and video purchase record data to Meta, TikTok, TradeDesk, AdRoll, and Google.

59.     Plaintiff Garza discovered that Defendant surreptitiously collected and transmitted her personally identifiable information in October 2023.

## CLASS ALLEGATIONS

60.     **United States Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have Facebook accounts and purchased movie tickets on drafthouse.com (the "United States Class").

61.     **California Class Definition**: Plaintiff also seeks to represent a Class of similarly situated individuals defined as all Class members in the State of California who purchased movie tickets on drafthouse.com (the "California Class").  Because the California Class includes individuals who do not have Facebook accounts (and thus would not be included in the United States Class), the California Class is its own separate and distinct Class and not a Subclass of the United States Class.

62.     Subject to additional information obtained through further investigation and discovery, the above-described United States Class and California Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

63.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**:  At this time, Plaintiff does not know the exact number of members of the aforementioned Class and California Class.  However, given the popularity of Defendant's website, the number of persons within the United States Class and California Class is believed to be so numerous that joinder of all members is impractical.

64.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**:  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the United States Class and California Class that predominate over questions that may affect individual members of the United States Class and California Class include:

(a)     whether Defendant collected Plaintiff's and the Class's PII;

(b)     whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c)     whether Defendant's disclosures were committed knowingly;

(d)     whether Defendant's disclosures were committed willfully;

(e)     whether Defendant disclosed Plaintiff's and the Class's PII without consent; and

(f)     whether Defendant's conduct violates California Civil Code § 1799.3.

65.     **Typicality (Fed. R. Civ. P. 23(a)(3))**:  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the United States Class and California Class, used

Alamo's website to purchase movie tickets, and had her PII collected and disclosed by Defendant without her consent.

66. **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and Cal. Civ. Code § 1799.3. Plaintiff and her counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor her counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant may take.

67. **Superiority (Fed. R. Civ. P. 23(b)(3))**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. Even if every member of the United States Class and California Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Classes. Plaintiff anticipates no difficulty in the management of this action as a class action.

**CAUSES OF ACTION**
**COUNT I**
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***

68.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

69.     Plaintiff brings this claim individually and on behalf of the members of the proposed United States Class against Defendant.

70.     Defendant is a "video tape service provider" because it is a cinema chain where consumers can purchase movie tickets to view movies at Alamo's theater locations across the country, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  In particular, by allowing consumers to purchase a ticket to a movie, Alamo is "rent[ing]" consumers access to view "prerecorded … audio visual materials," on its physical premises and is "deliver[ing]" consumers those same prerecorded audio visual materials on its premises by playing them on a cinema screen.

71.     Defendant is also a "video tape service provider" because it operates an online, on-demand video streaming service on drafthouse.com, where consumers can rent or purchase videos to stream on their own personal devices and watch in the privacy of their own homes.[35]

72.     Plaintiff and members of the United States Class are "consumers" because they have paid for movie tickets via Alamo's website for movies shown at Alamo's theaters.  18 U.S.C. § 2710(a)(1).

73.     Defendant disclosed to a third party, Facebook, Plaintiff's and the United States Class members' personally identifiable information.  Defendant utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like her Facebook ID, along with Plaintiff's event data, like the title of the videos she viewed.

---

[35] ALAMO, ONDEMAND VIDEO, https://ondemand.drafthouse.com/?_gl=1*qqhmhu*_ga*MTU5NTgyNTMwOF8xNjk4NDI2MjQ0 *_ga_79KMFG4HC7*MTY5OTMwMzQxNS42LjEuMTY5OTMwMzQxOC41Ny4wLjA.&_ga= 2.190387371.1053219652.1699303418-1595825308_1698426244

1

2

74.     Defendant knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

3

4

75.     Plaintiff and United States Class members did not provide Defendant with any form of consent – either written or otherwise – to disclose their PII to third parties.

5

6

7

8

76.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

9

10

11

12

13

77.     On behalf of herself and the United States Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

14

15

## COUNT II
### Violation of California Civil Code § 1799.3

16

78.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

17

18

79.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant.

19

20

21

22

80.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales and rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

23

24

25

26

27

81.     Defendant is a "person providing video recording sales … services" because it sells tickets on drafthouse.com for consumers to access its movie screenings, and thereby delivers thousands of videos throughout its theater locations.  Defendant is also a "person providing video recording … rental services" because it is "rent[ing]" access to view "prerecorded… audio visual materials," on its physical premises by selling tickets to watch movies in its cinemas.

28

82.     Defendant disclosed to Meta, TikTok, TradeDesk, AdRoll, and Google Plaintiff's and the California Class members' personal information and/or the records of Plaintiff and California Class members' ticket sales information.  Defendant utilized the Meta, TikTok, TradeDesk, AdRoll, and Google Analytics Tracking Pixels to compel Plaintiff's web browser to transfer Plaintiff's personal information, like their Facebook ID (to Meta's Tracking Pixel), along with Plaintiff's event data, like the title of the movie they purchased tickets to and the Alamo theater location those tickets were purchased for.

83.     Plaintiff and the California Class members purchased tickets to movie screenings using Alamo's website, drafhouse.com.

84.     Defendant willfully disclosed Plaintiff's personal information because it used that data to build audiences on Facebook and other websites to then retarget her for its advertising campaigns.

85.     Plaintiff and California Class members did not provide Defendant with any form of consent – either written or otherwise – to disclose their personal information to third parties.

86.     On behalf of herself and the California Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the California Class by requiring Defendant to comply with Cal. Civ. Code §1799.3's requirements for protecting a consumer's personal information; (iii) statutory damages of $500 for each violation of the Cal. Civ. Code §1799.3 pursuant to Cal. Civ. Code §1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the United States Class and California Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as a representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     An award of statutory damages to the extent available;

(e)   For punitive damages, as warranted, in an amount to be determined at trial;

(f)   For prejudgment interest on all amounts awarded;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  November 13, 2023          **BURSOR & FISHER, P.A**.

By:  ____*/s/ Stefan Bogdanovich*____
Stefan Bogdanovich

L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
         sbogdanovich@bursor.com

*Attorneys for Plaintiff*