**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
            sbogdanovich@bursor.com

*Attorneys for Plaintiff Daisy Garza*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAISY GARZA, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiff,<br><br>      v.<br><br>ALAMO INTERMEDIATE II HOLDINGS, LLC<br><br>                                        Defendant. | Case No. 3:23-cv-05849-VC<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: February 22, 2024<br>Time: 10:00 a.m.<br>Courtroom: 4 |

## NOTICE OF MOTION AND MOTION

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE THAT** on February 22, 2024 at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, 94102, Plaintiff Daisy Garza will and does move for an order entering partial summary on her First Cause of Action under the Video Privacy Protection Act, establishing that Defendant Alamo Intermediate II Holdings, LLC is a "video tape service provider" under 18 U.S.C. § 2710(a)(4).

This Motion is based on this Notice of Motion and Motion, Memorandum of Points and Authorities in support, and all documents or other arguments as may be presented to the Court.

Dated: January 18, 2024                    **BURSOR & FISHER, P.A**.

                                           By:    /s/ *Stefan Bogdanovich*
                                                     Stefan Bogdanovich

                                           L. Timothy Fisher (State Bar No. 191626)
                                           Stefan Bogdanovich (State Bar No. 324525)
                                           1990 North California Blvd., Suite 940
                                           Walnut Creek, CA 94596
                                           Telephone: (925) 300-4455
                                           Facsimile: (925) 407-2700
                                           Email: ltfisher@bursor.com
                                                     sbogdanovich@bursor.com

                                           *Attorneys for Plaintiff Daisy Garza*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF ISSUE TO BE DECIDED

Pursuant to Local Rule 7-4(a)(3), this Motion raises the following issue:

(1)     Whether Defendant is a "video tape service provider" as defined in the Video Privacy Protection Act, 18 U.S.C. § 2710(a)(4).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PAGE(S)**

MEMORANDUM OF POINTS AND AUTHORITIES................................................................1

I.        INTRODUCTION............................................................................................................1

II.       FACTS...............................................................................................................................4

III.     ARGUMENT .....................................................................................................................4

        A.      Alamo Drafthouse Is a Videotape Service Provider Because Conveying Open-Reel Movies is the "Focus of Defendant's Work.".......................4

        B.      Video Tape *Service* Providers Need Not Transfer Possessory Interests..........................................................................................................6

        C.      The VPPA Was Meant To Protect The Transactional *Privacy* By Giving Consumers The Right To Control The Information Generated By Those Transactions. ................................................................................9

        D.      *Osheske* and Alamo's "Policy-Laden" Arguments Are Misguided ........................11

        E.      This Motion For Partial Summary Judgment Is Ripe Because Alamo Raised the Issue First In Its Motion to Dismiss........................................13

**TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*Barfield v. Sho-Me Power Elec. Co-op.*,
  2014 WL 1955107 (W.D. Mo. May 14, 2014)...........................................................15

*Cantu v. Tapestry, Inc.*,
  2023 WL 4440662 (S.D. Cal. July 10, 2023).............................................................5

*Caraluzzi v. Prudential Sec., Inc.*,
  824 F. Supp. 1206 (N.D. Ill. 1993)...........................................................................15

*Carroll v. Gen. Mills, Inc.*,
  2023 WL 4361093 (C.D. Cal. June 26, 2023).............................................................5

*Carroll v. Gen. Mills, Inc.*,
  2023 WL 6373868 (C.D. Cal. Sept. 1, 2023)..............................................................5

*Cazarez–Gutierrez v. Ashcroft*,
  382 F.3d 905 (9th Cir. 2004).....................................................................................7

*Davis v. Mich. Dep't of Treasury*,
  489 U.S. 803 (1989)...................................................................................................7

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017).....................................................................................9

*Donaeva v. Client Servs., Inc.*,
  2019 WL 3067108 (E.D.N.Y. July 12, 2019)...........................................................15

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017).....................................................................................9

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015).................................................................................8

*Encino Motorcars, LLC v. Navarro*,
  138 S. Ct. 1134 (2018).........................................................................................2, 13

*Fireside Bank v. Super. Ct.*,
  40 Cal.4th 1069 (2007).............................................................................................14

*Fraser v. Bureau of Alcohol*,
  No. 3:22CV410, 2023 WL 5616011 (E.D. Va. Aug. 30, 2023)................................15

*Ghanaat v. Numerade Labs, Inc.*,
  2023 WL 5738391 (N.D. Cal. Aug. 28, 2023)............................................................5

*Goldstein v. Fandango Media, LLC*,
  2023 WL 3025111 (S.D. Fla. Mar. 7, 2023) ............................................................. 2

*Hernandez v. The Container Store, Inc.*,
  2024 WL 72657 (C.D. Cal. Jan. 3, 2024) ................................................................. 5

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019) ................................................................. 1, 5

*In re Hulu Priv. Litig,*
  2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ........................................................ 6, 7

*In re Vizio, Inc., Consumer Priv. Litig.*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) ............................................................ passim

*Jackson v. Fandom, Inc.*,
  2023 WL 4670285 (N.D. Cal. July 20, 2023) ...................................................... 5, 6, 9

*Louth v. NFL Enterprises LLC*,
  2022 WL 4130866 (D.R.I. Sept. 12, 2022) .......................................................... 1, 5

*MAI Sys. Corp. v. Peak Comput., Inc.*,
  991 F.2d 511 (9th Cir. 1993) ................................................................................. 9

*Miller v. Peter Thomas Roth, LLC*,
  2020 WL 363043 (N.D. Cal. Jan. 22, 2020) ............................................................ 14

*Mollett v. Netflix, Inc.*,
  795 F.3d 1062 (9th Cir. 2015) ...................................................................... passim

*Osheske v. Silver Cinemas Acquisition Co.*,
  2023 WL 8188464 (C.D. Cal. Oct. 31, 2023) ...................................................... passim

*Paris Adult Theatre I v. Slaton*,
  413 U.S. 49 (1973) ............................................................................................. 12

*Rodriguez v. Hershey Co.*,
  2023 WL 6798506 (S.D. Cal. Oct. 12, 2023) ............................................................ 5

*Schwarzschild v. Tse*,
  69 F.3d 293 (9th Cir. 1995) ................................................................................. 14

*Stark v. Patreon, Inc.*,
  635 F. Supp. 3d 841 (N.D. Cal. 2022) ............................................................ 4, 5, 6

*Tawam v. Feld Ent. Inc.*,
  2023 WL 5599007 (S.D. Cal. July 28, 2023) ...................................................... 5, 6, 7

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001) .............................................................................................. 8

*Villa v. San Francisco Forty-Niners Ltd.*,
    104 F. Supp. 3d 1017 (N.D. Cal. 2015) ......................................................................... 14

*Yershov v. Gannett Satellite Info. Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016) ............................................................................................ 8

*Zuber v. Allen*,
    396 U.S. 168 (1969) ................................................................................................. 2, 13

**STATUTES**

18 U.S.C. § 2710 ................................................................................................. 1, 4, 8, 10

**RULES**

Fed. R. Civ. P. 23 ............................................................................................................ 14, 15

**OTHER AUTHORITIES**

S. Rep. 100-599 ....................................................................................................... passim

S. Rep. 112-258 ................................................................................................................. 9

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

Defendant Alamo Intermediate II Holdings, LLC, a cinema chain, argues it need not comply with the Video Privacy Protection Act because the law does not cover businesses operating movie theaters and selling movie tickets. *See generally*, ECF No. 12 (Motion to Dismiss). Alamo is wrong. The VPPA applies to any person deemed a "video tape service provider" ("VTSP") and, except for a few narrow exceptions, imposes civil liability on such person for "knowingly disclosing… personally identifiable information concerning any consumer." 18 U.S.C. § 2710(b)(1). As this Court knows, VTSP is broadly defined to include "any person, engaged in the business… of … delivery of… similar audio visual materials." 18 U.S.C. § 2710(a)(4). The "Senate Report recommending passage of the VPPA specifically identifies '<u>open-reel movies</u>,' as the types of technologies that provide 'similar audio visual materials,' beyond video cassette tapes." *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (cleaned up) (quoting S. Rep. 100-599, at 12). As applied here, Alamo is a VTSP because it is "engaged in the business" "of" "delivering" "open-reel movies" on the silver screen.

*All but one* court in the Ninth Circuit has adopted the following two-pronged test to determine whether someone is a VTSP: (1) the business is "substantially involved in the conveyance of video content to consumers" and (2) is "also significantly tailored to serve that purpose." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017); *accord In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (Chhabria, J.). A cinema chain like Alamo readily satisfies this two-part test. In broad strokes, Alamo's business model consists of: (1) operating movie theaters, (2) selling movie tickets, and, until shortly after this suit was filed (3) Alamo operated an online video streaming

service. Any one of these three functions independently establishes that Alamo is a VTSP. Collectively, there can be no question they show Alamo is a VTSP.

Many of Alamo's arguments to the contrary (presented in its Motion to Dismiss) are directly copied from *Osheske v. Silver Cinemas Acquisition Co.*, 2023 WL 8188464, at *3 (C.D. Cal. Oct. 31, 2023), *appeal filed* (9th Cir., Nov. 30, 2023), a decision Defendant dares not cite in its Motion to Dismiss as if it were *Harry Potter*'s Voldemort.[1] *Osheske* is an outlier whose reasoning conflicts with every other Ninth Circuit case that has ever looked at what it means to be a VTSP. *Osheske* also conflicts with the only other VPPA decision involving movie ticket sellers. *Goldstein v. Fandango Media, LLC*, 2023 WL 3025111, at *3 (S.D. Fla. Mar. 7, 2023) (denying motion to dismiss because a movie ticket seller may well be a VTSP). Viewed in the VPPA's larger textual context, the Alamo and *Osheske* interpretation of the VPPA renders the words "delivery," "subscriber," "video services," and "service provider" largely, if not wholly, superfluous. The Alamo and *Osheske* interpretation also clashes with the VPPA's 2012 Amendment, meant to cover online video streaming services. While it is true Congress never mentioned movie theaters when it first passed the law, "[l]egislative silence is a poor beacon to follow in discerning the proper statutory route." *Zuber v. Allen*, 396 U.S. 168, 185 (1969). "Even if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018). "Consistent with Congress's purpose, the [VPPA]'s language is broad." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).

At their core, both *Osheske* and Alamo's strained interpretations of the VPPA rest on the misguided notion that the law's privacy protections disappear in "public places." But the VPPA was passed after a list of videos Robert Bork rented was leaked from his local Blockbuster—a

---

[1] Available for viewing at Defendant's movie theaters on certain "Summer Movie Nights." *See* https://drafthouse.com/sf/show/summer-movie-nights-harry-potter-and-the-sorcerers-stone.

public place. Even though every other customer in the checkout line could see, *in plain view*, what VHS tapes Bork was renting as they trudged along the conveyor belt, that did not entitle Blockbuster to disclose his records to any other fourth-party that came along. Indeed, that information was ***never*** Blockbuster's to give. Above all, "[t]he VPPA was meant to give consumers the power to 'maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers.'" Compl. ¶ 4 (quoting S. Rep. No. 100-599, at 8) (emphasis added). As the Ninth Circuit has recognized, "Congress's intent in passing the VPPA therefore evinces the principle that protection is merited when the consumer lacks control over the dissemination of the information at issue." *Netflix*, 795 F.3d at 1065–66.

This principle applies with equal force to movie theaters. Simply because moviegoers wish to see a movie on the silver screen with friends and strangers does not mean they wish to be "chaperoned by a sizeable number of digital marketing companies…[who] not only remember the Alamo, but exactly who watched what, when, and where." Compl. ¶ 1. Indeed, simply because movie-goers attend what *Osheske* calls a "public event" does not mean those same movie goers wish to *be* the public event." The injury here is precisely the one *Netflix* holds the VPPA protects.

Partial summary judgment on this narrow issue is ripe. There is no factual dispute: Defendant operates movie theaters and sells tickets to movie showtimes on drafthouse.com. The only question before the Court is one of pure statutory interpretation: Is a business that operates movie theaters and sells movie tickets a video tape service provider under the VPPA? Plaintiff Garza insists that it is. And Defendant Alamo cannot claim it is prejudiced by a decision on this issue this early in the case. After all, it was Alamo that brought this very same issue before the Court in the first place.

1

## II.     FACTS

"Alamo Drafthouse was founded in Austin, TX… Their first theater… was a handbuilt one screen operation." https://drafthouse.com/sf/about/history. Today, Alamo operates dozens of movie theaters across our nation. *Id*; *accord* Bogdanovich Decl. ¶ 2, and Ex. A. On its website, it sells movie tickets to movie screenings at its movie theaters. Bogdanovich Decl. ¶ 2 and Ex. A. Until a few weeks before Alamo's responsive pleading was due, it also operated an on-demand video streaming service, where people could buy or rent videos they could stream on Defendant's website. *Id*. ¶ 3 and Ex. B. Alamo owns this website, *id*. ¶ 4, and operates this enterprise, *id*., Ex. A.

## III.    ARGUMENT

### A.     Alamo Drafthouse Is a Videotape Service Provider Because Conveying Open-Reel Movies is the "Focus of Defendant's Work."

A video tape service provider is defined as "any person, engaged in the business ... of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4). "When used in this context, 'business' connotes 'a particular field of endeavor,' *i.e.*, a focus of the defendant's work." *In re Vizio, Inc., Consumer Priv. Litig*., 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). Alamo, a cinema chain, is a VTSP because delivering movies on the silver screen is the focus of its work.

"Consistent with Congress's purpose, the statute's language is broad." *Mollett v. Netflix, Inc*., 795 F.3d 1062, 1066 (9th Cir. 2015). "Courts have generally construed 'similar audio visual materials' broadly," and have uniformly held that it covers any kind of "prerecorded video content." *Stark v. Patreon, Inc*., 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022) (collecting cases). And the "Senate Report recommending passage of the VPPA specifically identifies 'open-reel movies,' as the types of technologies that provide 'similar audio visual materials,' beyond video

cassette tapes." *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (cleaned up) (quoting S. Rep. 100-599, at 12).

The question of whether the Alamo is a VTSP thus turns on whether Alamo is "<u>engaged in the business</u>… of rental, sale, or <u>delivery</u>" of "open-reel movies." In making this determination, *all but one* court in the Ninth Circuit has adopted a two-pronged test: (1) the business is "substantially involved in the conveyance of video content to consumers" and (2) is "also significantly tailored to serve that purpose." *Vizio*, 238 F. Supp. 3d at 1221; *Facebook*, *supra*, 402 F. Supp. 3d at 799; *Patreon*, 635 F. Supp. 3d at 851; *Carroll v. Gen. Mills, Inc*., 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023); *Cantu v. Tapestry, Inc*., 2023 WL 4440662, at *8 (S.D. Cal. July 10, 2023); *Jackson v. Fandom, Inc*., 2023 WL 4670285, at *3 (N.D. Cal. July 20, 2023); *Tawam v. Feld Ent. Inc*., 2023 WL 5599007, at *4 (S.D. Cal. July 28, 2023); *Ghanaat v. Numerade Labs, Inc*., 2023 WL 5738391, at *2 (N.D. Cal. Aug. 28, 2023); *Carroll v. Gen. Mills, Inc*., 2023 WL 6373868, at *3 (C.D. Cal. Sept. 1, 2023); *Rodriguez v. Hershey Co*., 2023 WL 6798506, at *2 (S.D. Cal. Oct. 12, 2023); *Hernandez v. The Container Store, Inc*., 2024 WL 72657, at *2 (C.D. Cal. Jan. 3, 2024).

*But see Osheske v. Silver Cinemas Acquisition Co*., 2023 WL 8188464, at *3 (C.D. Cal. Oct. 31, 2023), *appeal filed* (9th Cir., Nov. 30, 2023).

A movie theater operator like Alamo Drafthouse readily satisfies the two-pronged *Vizio* test. The cinema chain is "substantially involved in the conveyance of video content to consumers" and its business model is "significantly tailored to serve that purpose." Defendant is not only "substantially involved" in conveying video content—it is "obsessed with" it. Bogdanovich, Decl., Ex. A ("At Alamo Drafthouse we're obsessed with making sure that each film looks and sounds the best it possibly can."). And the business model—from Alamo's theaters, its online ticket selling platform, its comfy seats, to even its vintage "35mm projector[s]… for visionary filmmakers like Christopher Nolan and Paul Thomas Anderson"—is "significantly tailored to serve that purpose."

*See id.* That Alamo's movie theaters *also* sell popcorn and, as *Osheske* and Alamo put it, a "license[] to enter the theatre premises," 2023 WL 8188464, at *4; *see also* MTD at 2:7, does not change the outcome. People don't visit the cinema to taste the "good food," MTD at 3, wander carpeted halls, or sit in dark rooms—they come to watch "open-reel movies." S. Rep. 100-599, at 12. Conveying those movies on the screen is the "focus of defendant's work," *Vizio*, 238 F. Supp. 3d at 1221, without which no one would come. "Everyone who works at Alamo Drafthouse, from the managers to the servers to the kitchen staff, is passionate about film." Bogdanovich Decl., Ex. A. Indeed, "[t]he requirement that a defendant be 'engaged in the business ... of rental, sale, or delivery' of video content is typically straightforward to apply in cases" like this one, "in which the defendant directly rents or sells… access to [video] content over the internet." *Tawam*, 2023 WL 5599007, at *4 (collecting cases).

Alamo's second line of business, operating an on-demand video streaming service, Bogdanovich Decl. ¶ 3, Ex. B, also satisfies this two-pronged test. Indeed, numerous courts have held that online video streaming services are video tape service providers. *See, e.g.*, *Fandom*, *supra*, 2023 WL 4670285, at *3; *Patreon*, *supra*, 635 F. Supp. 3d at 85; *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012).

### B.   Video Tape *Service* Providers Need Not Transfer Possessory Interests.

*Osheske* ignored every other Ninth Circuit decision interpreting the term "video tape service provider" and held that movie theaters do not qualify because "the words 'rental, sale, or delivery' in the statutory definition… describe a transfer of some possessory interest in the audio visual materials." 2023 WL 8188464, *3; *see also* MTD at 6-8 (repeating the same argument without attributing the source). Under this framework "movie theaters… do not sell (or even rent) *audio visual materials*" and "to say a movie theater 'delivers' movies is to stretch the natural meaning of the verb beyond recognition." *Id.* at *4 (emphasis in original). Plaintiff disagrees.

"Delivery," at the time of the VPPA's passage meant "to produce the promised, desired, or expected results," or "to send (something aimed or guided) to an intended destination." Webster's Third New International Dictionary, Unabridged, Kindle Edition (intransitive verb, def. 4; verb, def. 5).[2] If Alamo's 35mm projector broke and the movie did not play, movie-goers would say Alamo "failed to deliver" the movies they paid to see. As the *Vizio* court noted, "lest the word 'delivery' be superfluous, a person need not be in the business of either renting or selling video content for the statute to apply. Further, Congress's use of the phrase 'similar audiovisual materials' indicates that the definition is <u>medium-neutral</u>; the defendant must be in the business of delivering video content, but that content need not be in a <u>particular format</u>." 238 F. Supp. 3d at 1221 (emphasis added) (citing *Hulu*, *supra*, 2012 WL 3282960, at *5). So while *Osheske* correctly notes that "movie theaters … do not rent or sell audio visual materials themselves," 2023 WL 8188464, at *1, a defendant can still be in the business of "delivering" audio visual materials where "the defendant directly rents or sells… <u>access to</u> [video] content." *Tawam*, 2023 WL 5599007, at *4 (collecting cases). Movie theaters do exactly that: "Alamo 'rent[s]' consumers <u>access to</u> view 'prerecorded … audio visual materials,' on its physical premises." Compl., ¶ 70; *accord* Bogdanovich Decl. ¶ 2, Ex. A.

Worse yet, the *Osheske* court errs by singling out its preferred definitions of "rent," "sell," "deliver," and "materials," outside the VPPA's broader statutory context. "Statutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Cazarez–Gutierrez v. Ashcroft*, 382 F.3d 905, 912 (9th Cir. 2004) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Several other definitions in the VPPA do ***not*** require any possessory interest in—or "exclusive control over," *see* MTD at 7—audio visual materials.

---

[2] The original print version of this dictionary was updated both in 1986 and 1993.

Indeed, the other party to a VPPA transaction, the "'consumer' means any renter… or <u>subscriber</u> of goods <u>or services</u> from a video tape <u>service</u> provider." 18 U.S.C. § 2710(a)(1); *see also* Plaintiff's forthcoming opposition to motion to dismiss. And the "personally identifiable information" the VPPA protects from disclosure "includes information which identifies a person as having requested or obtained specific video materials <u>or services</u> from a video tape <u>service</u> provider." 18 U.S.C. § 2710(a)(3).

Indeed, if video tape <u>service</u> providers need to be in the business of transferring possessory interest in video <u>materials</u>, then the term itself would be a misnomer, and we should instead call them video tape <u>material</u> providers. Virtually all their consumers would be "renters or purchasers… of goods," and the VPPA's inclusion of the words "or services" in the definition of consumer would be largely, if not wholly, superfluous. Thus, the *Osheske* transfer of possessory interest test flouts the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (cleaned up). After all, a person can "rent," "request," or "obtain" "specific video… <u>services</u>" without obtaining possession of "audio visual <u>materials</u>" themselves, like a physical video tape or a downloaded computer file.

The same could be said of the VPPA's inclusion of "subscriber" in its definition of consumer, which would also be largely superfluous under the *Osheske* test. Sister Circuit Courts scouring the dictionary definitions of "subscriber" have expressly held that "subscribers" under the VPPA are individuals who often obtain "<u>access to</u> exclusive or restricted content." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 56-1257 (11th Cir. 2015) (emphasis added); *accord Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016) (holding that plaintiff was a subscriber under the VPPA because he gained "<u>access to</u> Gannett's video content") (emphasis added). Again, that is precisely what we have here: "by allowing consumers to purchase a ticket to

a movie, Alamo is 'rent[ing]' consumers <u>access to</u> view 'prerecorded … audio visual materials,' on its physical premises." Compl., at ¶ 70; Bogdanovich Decl. ¶ 2.

Make no mistake: the new *Osheske* "transfer of possessory interest" test abrogates over a decade's worth of VPPA case law and undoes the 112th Congress's 2012 amendment of the statute. Under the new *Osheske* test, *Vizio* would need to be reversed. *See* 238 F. Supp. 3d at 1221 (holding that a Smart TV with internet access was a VTSP). As would this Court's decision in *Facebook*, along with *Hulu*, *Fandom*, and *Patreon*, because a "website that hosts prerecorded streaming video content," *Fandom*, 2023 WL 4670285, at *3, often does not have <u>any possessory interest to give</u>. Instead, most, if not all, video streaming websites merely hold a copyright <u>license</u> to replay something on their platforms. If such a website were to actually transfer a possessory interest in the video file—*i.e.*, make it available for download—it would be committing copyright infringement. *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 854 and 856-57 (9th Cir. 2017) (holding that an internet video streaming service could not "lawfully re-sell or rent" videos for download without the copyright holder's permission); *see also MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) ("a 'copying' for purposes of copyright law occurs when a computer program is transferred from a permanent storage device to computer's RAM."). We know this cannot be the correct outcome, because the VPPA was amended in 2012 to accommodate new "Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, 2.

**C.    The VPPA Was Meant To Protect The Transactional *Privacy* By Giving Consumers The Right To Control The Information Generated By Those Transactions.**

The VPPA is "a context-specific extension of the substantive right to privacy." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017). And the relevant context "is intended to be <u>transaction-oriented</u>. [Subject to few exceptions, the VPPA prohibits the disclosure

of] information that identifies a particular person as having engaged in a <u>specific transaction</u> with a video tape service provider." S. Rep. 100-599, at 12 (emphasis added). Congress was concerned about "the trail of information generated by every <u>transaction</u> that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id*. at 7 (emphasis added). Thus, the VPPA was enacted to "allow[] consumers to maintain control over personal information… <u>generated in exchange</u> for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "Congress's intent in passing the VPPA therefore evinces the principle that protection is merited when the consumer lacks control over the dissemination of the information at issue." *Netflix*, 795 F.3d at 1065–66.

The VPPA's focus on transactions is also exhibited from its definition of the "personal identifiable information" it seeks to keep private: "information which identifies a person as having <u>requested or obtained</u> specific video materials or services." 18 U.S.C. § 2710(a)(3) (emphasis added). This definition makes clear that the VPPA doesn't care whether a consumer ever watches a video, or as Alamo puts it, presses "fast forward, pause, rewind, [or] turn on subtitles." Mot. at 2. At the time the VPPA was written, many people that rented VHS tapes from Blockbuster often forgot to watch them—a busy jurist like Robert Bork is no exception. The privacy violation leading to the VPPA's passage was not the disclosure of what video Judge Bork watched at home, but the list of the 146 films he "requested or obtained" at the public checkout counter. Whether Judge Bork ever got around to playing his VHS tape (or made or missed a movie showtime) is immaterial. To hold otherwise would require Plaintiffs to plead Stanley Kubrick's *A Clockwork Orange*[3] just to state a claim. *See* https://www.youtube.com/watch?v=uSQApGLbgNg (scene of scientists forcing a subject to watch a film in a theater by prying his eyes open with a mechanical device).

---

[4] Available for viewing at Defendant's movie theaters on certain "Weird Wednesdays." *See* https://drafthouse.com/sf/show/weird-wednesday-clockwork-orange.

A violation of VPPA's right to transactional privacy is exactly what is alleged here. Alamo discloses consumers' individual movie ticket transactions to a staggering number of digital marketing companies. Compl., ¶ 1. And when viewed in its proper context, the online movie ticket transactions at issue here are *more private* than in-person video-rental store transactions, as web-surfers cannot see what tickets others theater patrons are buying.

Indeed, the VPPA was enacted based on Congress's prescient fear that, one day, "it would be relatively easy at some point to give a profile of a person [by reviewing] what they buy in a store." S. Rep. 100-599, at 6. Money talks. In today's digital world, where computer algorithms constantly bombard us with various kinds of unsolicited video media on "our personal devices," *see* MTD at 9, movie ticket purchases are more probative of our personalities than any other kind of video transaction. The fact a consumer chooses to spend nearly $20 of their hard-earned money watching *Killers of the Flower Moon* in a dark theater for three and a half hours, *see* Compl., Fig. 4, tells one much more about that individual's personality than the name of a show auto-played on his or her Netflix account, with the pop-up asking "Are you still watching?" In today's world, if we are to "give meaning to the concept of privacy… as it affects individuals in their daily lives," S. Rep. 100-599, at 6, the VPPA's statutory right must apply to these precious few moments when consumers can sit down in their cinema seats, silence their phones, and simply unplug.

**D.     *Osheske* and Alamo's "Policy-Laden" Arguments Are Misguided**

Undergirding the *Osheske* court's contrary holding was its gut feeling that the VPPA's privacy protections should not "cover the *public* act of attending a movie theater." 2023 WL 8188464, at *1 (C.D. Cal. Oct. 31, 2023) (emphasis in original); *see also, id*., *generally* (using the phrases "public act," "public event," or "public accommodation" 13 times); *see* also *generally*, MTD (same, using the word "public" to describe Alamo's theaters another 7 times).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

     Not so. "The VPPA was enacted in 1988 in response to the Washington City Paper's publication of… a list of the 146 films that the Bork family had rented from a Washington, D.C.-area video store." *Netflix, supra*, 795 F.3d at 1065 (citing S. Rep. 100–599, at 5 (1988)). Visiting the "Washington, D.C.-area video store" to rent a movie is as much a "*public* act" as watching a movie at one's local theater. And video rental stores are just as much "places of public accommodation" as movie theaters. *Osheske*, 2023 WL 8188464, at *4. Indeed, every other customer waiting in line at a 1980s Blockbuster could see, in plain view, what films Judge Bork was renting as his VHS tapes were trudging down the conveyor belt at the checkout counter.  Just because those customers incidentally saw what videos he rented did not entitle Blockbuster to disclose his data to the highest bidder. Indeed, it was ***never*** Blockbuster's information to give. "The Act allows consumers to <u>maintain control</u> over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8 (emphasis added).

16
17
18
19
20
21
22

     *Osheske* also notes that movie-goers are "attend[ing] a ***public event.***" 2023 WL 8188464, at *4 (emphasis added). But if anything, that makes movie screenings *more private* than visits to the video rental store. As any city-slicker knows, there is anonymity in the crowd. And when the cinema lights dim and the films begin, we all know what some teenage couples sitting in the back row tend to do.[4] Indeed, simply because people attend public events does not mean they wish to be chaperoned by their nosy parents, or even nosier digital marketing companies.

23
24
25
26
27

     *Osheske* also repeatedly relies on the Supreme Court's decision in *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65 (1973), which held that the beleaguered <u>constitutional</u> right to privacy did not extend to "private acts conducted in public places" like adult movie theaters. 2023 WL 8188464, at *4; *see also* MTD at 10 (also citing constitutional case law to limit scope of VPPA).

28

---

[4] To say nothing of what patrons at adult movie theaters did.

That misses the mark. Congress expressly passed the VPPA to create a <u>statutory</u> right to privacy because the <u>constitutional</u> right <u>did not go far enough</u>. Summarizing constitutional case law, Congress lamented that "[t]he Court stopped short of adopting an explicit right to personal information privacy," so it reasoned "it is the role of the legislature to define, expand, and give meaning to the concept of privacy… as it affects individuals in their daily lives." S. Rep. 100-599, at 4 and 6. It thus makes little sense for the Court to look to <u>constitutional</u> case law to cordon off the limits of the VPPA's <u>statutory</u> right.

Indeed, had Judge Bork been a patron of the Paris Adult Theatre and had the list of the movie tickets he purchased from there got leaked, it strains credulity to think that the same Congress that passed the VPPA would have nothing to say about that. It is precisely for this reason that *Osheske* and Alamo's argument about the legislative silence on movie theaters carries little weight. 2023 WL 8188464, at *5; *see also* MTD at 11 (repeating the same argument without attributing a source). "Legislative silence is a poor beacon to follow in discerning the proper statutory route." *Zuber v. Allen*, 396 U.S. 168, 185 (1969). "Even if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018).

Accordingly, *Osheske* and Alamo's "policy-laden argument[s] cannot overcome the statute's plain meaning." *Vizio*, 238 F. Supp. 3d at 1222.

### E. This Motion For Partial Summary Judgment Is Ripe Because Alamo Raised the Issue First In Its Motion to Dismiss.

Partial summary judgment on the narrow issue of whether the Alamo's movie theater chain is a VTSP is ripe for adjudication. There is no factual dispute, so the only question before the Court is one of pure statutory interpretation: whether such a business is covered by the VPPA. And because the Alamo raised the same issue first in its motion to dismiss, summary judgment does not offend the "one-way intervention rule."

The "one-way intervention rule" generally prevents class action parties from seeking summary judgment before moving for class certification. *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995). In these cases, members of a not yet certified class have a "one-way" advantage where, if the putative class representative wins summary judgment, others could opt-in to a winning case, but if the representative loses summary judgment, others need not be joined or bound to the losing one. *Id*. Accordingly, the rule seeks to protect class action defendant from "being pecked to death by ducks." *Fireside Bank v. Super. Ct*., 40 Cal.4th 1069, 1078 (2007) (discussing class action devices including Fed. R. Civ. P. 23).

"But that rationale disappears when the defendant himself" chooses to antagonize the ducks first.  *Schwarzschild*, 69 F.3d at 297. Where, as here, defendants like Alamo "have weighed the options and chosen to attack early, rather than wait to bind a class to their victory," they "explicitly agreed to waive their protections against one-way intervention." *Miller v. Peter Thomas Roth, LLC*, 2020 WL 363043, at *2 (N.D. Cal. Jan. 22, 2020). And when a defendant waives the rule, a court may rule on a Plaintiff's motion for summary judgment before class certification. *Id*. In schoolyard parlance, this means if a Defendant like Alamo wants to "dish it," they better "be able to take it."

Alamo waived the one-way intervention by moving to dismiss the case and arguing that, as a matter of law, "the VPPA does not apply to movies viewed in public movie theaters."  ECF No. 12, at vi (Motion to Dismiss, Statement of Issues to be Decided).  It is thus proper for the Court to issue summary judgment on whether Alamo is, in fact, a VTSP under the VPPA.

Alamo may try to argue that, in *Villa v. San Francisco Forty-Niners Ltd*., the court held a defendant did not waive the one-way intervention rule by moving to dismiss. 104 F. Supp. 3d 1017, 1020 (N.D. Cal. 2015). Yet *Forty-Niners* is distinguishable, because there, the motion only sought to score a field goal—"test the sufficiency of the complaint." *Id*. Here, in contrast, Alamo attempts to ice the game by having the court decide, as a matter of law, that the VPPA does not apply to

movie theaters. *See* ECF No. 12. This is a <u>case-dispositive</u> argument and if Defendant prevails, leave to amend would be futile. Many courts have held that, where, as here, a defendant's motion to dismiss attempts to decide a "dispositive" issue, the one-way intervention rule is waived. *Caraluzzi v. Prudential Sec., Inc.*, 824 F. Supp. 1206, 1211 (N.D. Ill. 1993); *accord Fraser v. Bureau of Alcohol*, No. 3:22CV410, 2023 WL 5616011, at *3 (E.D. Va. Aug. 30, 2023) ("by filing its Motion to Dismiss (a dipositive motion)… without even mentioning that class certification should be addressed before the dispositive motion[], the Government 'has waived the procedural safeguards of Rule 23.'"); *Donaeva v. Client Servs., Inc.*, 2019 WL 3067108, at *1 (E.D.N.Y. July 12, 2019); *Barfield v. Sho-Me Power Elec. Co-op.*, 2014 WL 1955107, at *2 (W.D. Mo. May 14, 2014).

Dated: January 18, 2024

**BURSOR & FISHER, P.A**.

By: <u>   /s/ *Stefan Bogdanovich*      </u>
Stefan Bogdanovich

L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com
        sbogdanovich@bursor.com

*Attorneys for Plaintiff Daisy Garza*